FILED BY_____ scn _____D.C.

**Oct 14, 2025**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Fort Pierce

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**Case No. 2:25-cv-14067-AMC**

Kimberly Marasco,

     *Plaintiff,*

v.

     Taylor Swift, Aaron Dessner,
     Universal Music Group, Inc
         and Republic Records,

     *Defendants*

## SECOND AMENDED COMPLAINT

Plaintiff , **Kimberly Marasco** ("Plaintiff"), proceeding *pro se*, respectfully submits this

**Second Amended Complaint** against Defendants **Taylor Swift, Aaron Dessner, Republic**

**Records, and Universal Music Group, Inc.**, and states as follows:

## (DEMAND FOR JURY TRIAL)

Plaintiff, Kimberly Marasco ("Plaintiff"), brings this complaint against Defendants and

alleges as follows:

## INTRODUCTION

1. Plaintiff Kimberly Marasco ("Plaintiff"), proceeding pro se, brings this action for copyright infringement against Defendants Taylor Swift, Aaron Dessner, Republic Records, and Universal Music Group, Inc. (collectively, "Defendants"). Plaintiff alleges that Defendants unlawfully copied original, protectable written and visual expressions from her published poetry collections and exploited those works in multiple songs, lyrics, music videos, and promotional campaigns without authorization. Plaintiff seeks damages and injunctive relief pursuant to 17 U.S.C. § 501 et seq., and remedies available under 17 U.S.C. §§ 502–505.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), as this action arises under the Copyright Act. Venue is proper in this District under 28 U.S.C. § 1400(a) because a substantial part of the events giving rise to the claims occurred in this District and Defendants transact business here. Furthermore, jurisdiction is proper when a non-resident Defendant has purposefully availed itself of the privilege of conducting activities in the forum state or has purposefully directed its conduct into the forum state.

3. Defendants promote and produce events in this District, including concerts, the sale of records, CDs, and merchandise, and the nationwide distribution and exhibition of the *Eras Tour* film, generating millions of dollars in local revenue. Such activities establish sufficient minimum contacts with this District such that the exercise of personal jurisdiction comports with due process and does not offend traditional notions of fair play and substantial justice. In addition, Defendant Taylor Swift performed three concerts at Hard Rock Stadium in Miami, Florida, on October 18–20, 2024. Each concert performance included a core setlist of songs which include some of the songs included in this complaint—*The Man, Illicit Affairs, My Tears Ricochet,*

*Who's Afraid of Little Old Me?, Down Bad, Fortnight, I Can Do It With a Broken Heart, Midnight Rain, Vigilante Sh\*\*, and Mastermind.*

## THE PARTIES

4. Plaintiff is a writer and author in Florida and owns the rights to creative works to include published books containing personal memoirs, poetry and other art. The works are titled: *Dealing with a Chronic Illness* (2017) and *Fallen from Grace* (2019). *Fallen From Grace* was renamed *Songs of the Unsung* in April of 2020.

5. Defendant Taylor Swift is an American singer-songwriter based in Nashville, TN and is and was doing business in the State of Florida and within this judicial district.

6. Defendant Aaron Dessner is a songwriter and a resident of New York and is and was doing business in the State of Florida and in this judicial district.

7. Defendant Universal Music Group, Inc., is a musical recording group with operational headquarters in California and is and was doing business in the State of Florida and in this judicial district and distributes the songs listed in this complaint.

8. Defendant Republic Records is an American record label for the Defendants. Based in New York, Republic Records is owned by Universal Music Group and released the infringing musical compositions for the songs listed in this complaint.

## FACTUAL BACKGROUND

9. Plaintiff authored and published poetry and story collections (Working Title): *Dealing with a Chronic Illness (retitled Fallen from Grace) (*"Dealing*")* registered with the U.S Copyright Office on July 11th, 2017 as TXU002200550. An earlier version of "Dealing" was registered with the Copyright Office as TXU001999165 on January 3, 2016. Plaintiff also authored (Working Title): *Fallen from Grace* registered on May 27, 2020 (retitled *Songs of the*

*Unsung* registered as TXu2061218 "Fallen"). Both the registered dates and distribution dates fall prior to the Defendants' songs listed in this case.

**10**. Furthermore, Plaintiff authored the song and poem titled "*Noah*" registered as TX 9-417-589 and has proof of when it was first published on social media and YouTube as a song. All of these works, combined, will be referred to as the "Works" by Plaintiff. Plaintiff is, and at all relevant times has been, the copyright owner of rights under United States copyright with respect to the Works. Please refer to **Exhibits A-1 through A-4** for copyright registrations.

**ACCESS**

**11**. Plaintiff's works were widely disseminated and **reasonably** available to Defendants through multiple channels, establishing the inference of access under well-recognized legal standards. Access requires only a "reasonable opportunity" to view the material. *Grubb v. KMS Patriots, L.P.*, 88 F.3d 1, 3 (1st Cir. 1996). Courts have consistently held that access may be inferred from circumstantial evidence such as widespread distribution, particularly where a work bears striking similarity to the defendant's. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th Cir. 2000).

**12. Copyright protection must apply equally to all creators, regardless of their fame or public recognition.** The fundamental purpose of copyright law is to safeguard the original creations of individuals, not to reward notoriety or commercial success. Granting greater protection to well-known authors over lesser-known or emerging creators would undermine the very essence of copyright—to protect original expression—and risk discouraging individuals from sharing their unique voices. Such inequality would stifle creativity, limit diversity in artistic contributions, and ultimately hinder cultural advancement.

**13.** Plaintiff's book *Fallen from Grace* was published by Outskirts Press in 2018 and subsequently re-published by Ukiyoto Publishing with a three-year contract (2019–2021), reaching international markets. Plaintiff's other book, *Songs of the Unsung*, was available on Amazon and Thriftbooks with approximately 300 copies sold globally—a significant reach for a self-published poet. Plaintiff's Works also garnered international attention, including coverage in *Forbes India* and *Literatura* magazine (Exhibit D).

**14.** Plaintiff was approached by several publishers and pitched her work to literary agencies, posted Works on social media and sent poems to poetry contests online--further placing it in creative circles connected to the entertainment industry. In **today's digital age**, access is even more readily inferred. Plaintiff's books and poems were continuously available through online platforms, searchable on the internet, and promoted through social media, including Plaintiff's Facebook profile with over 9,000 followers. **Courts have recognized that "widespread dissemination" alone can establish access.** *Bright Tunes Music Corp. v. Harrisongs Music, Ltd.*, 420 F. Supp. 177 (S.D.N.Y. 1976) (finding access where George Harrison plausibly heard the Chiffons' "He's So Fine"). Plaintiff's global distribution and media coverage made her work accessible to anyone—including Defendants—within the entertainment industry ecosystem.

**15.** Described in "Coquico, Inc. v. Rodríguez-Miranda, 562 F.3d 62, 67 (1st Cir. 2009)", probative similarity combined with opportunity suffices to establish access. Here, the "striking" similarities between **Plaintiff's Works and Defendants' lyrics are so specific, unique, and improbable that independent creation is unlikely**, supporting the inference of access. Courts have held that in cases of striking similarity, **direct proof of access is not required at all.**

**16.** Accordingly, the widespread dissemination of Plaintiff's books, international media attention, and online visibility establish a clear and reasonable opportunity for Defendants to

have encountered Plaintiff's work. Any defense that relies on outdated notions of access should be rejected in light of modern publication distribution via electronic means.

- Additional exposure of Plaintiff's works include the following media **(Exhibit D):**

- Youtube video prepared by publisher: ukiyoto fallen from grace Marasco author - Search

- Youtube video of Noah: Bing Videos

- Solstice Extravaganza: Plaintiff was featured in an online campaign promoting independent creators

**STATUTE OF LIMITATIONS**

**Continuing Wrong Doctrine (Separate Accrual Rule)**

**17.** The Defendants' previous argument that Plaintiff's claims are time-barred is without merit under the *continuing wrong* or *continuing infringement* doctrine. Each act of copyright infringement gives rise to a new and separate cause of action, with its own three-year limitations period. See *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014) (affirming the "separate-accrual rule"). Thus, even if the original publication of the infringing work occurred outside the limitations period, subsequent performances, distributions, or streaming of the work constitute new infringements that are independently actionable.

**18.** Defendants continue to exploit the infringing works, including by performing them in live concerts and distributing them through online platforms such as Spotify and other streaming services. Each of these ongoing uses constitutes a distinct infringing act, accruing a new three-year limitations period from the date of that act. For example, a performance in 2024 or 2025 gives rise to a timely claim regardless of the original date of publication.

**Discovery Rule**

19. The statute of limitations is also tolled under the discovery rule, which provides that a copyright claim accrues when the copyright owner discovers, or with reasonable diligence should have discovered, the infringement. See *Warner Chappell Music, Inc. v. Nealy*, "601 U.S. 366 (2024)". Where a claim is timely under the discovery rule, a plaintiff may recover damages for all infringing acts, regardless of when they occurred, without a three-year cap. Plaintiff discovered certain infringing uses only recently, including new performances, online distributions, and additional works not previously identified. Because Plaintiff could not have reasonably discovered all infringements at once, the statute of limitations for those claims began at the time of discovery.

**Combined Application**

20. Together, the continuing wrong doctrine and discovery rule confirm that Plaintiff's claims are timely. Ongoing acts of infringement by Defendants fall within the limitations period under the separate-accrual rule, and newly discovered infringements are actionable under the discovery rule.

## THE COPYRIGHTED WORKS AT ISSUE

21. According to IssueWire: "*Fallen from Grace* has already received a lot of positive feedback from the time of its launch and has been showcased to more than twenty-five thousand bookstores and retail chains across the globe for taking up and placing a copy at their stores. The title has also been made available on Ingram for wholesale purchase by stores and retailers." **(Exhibit B).**

22. Defendants infringed Plaintiff's exclusive rights under 17 U.S.C. §§ 106 and 602 by unlawfully and extensively copying Plaintiff's protected expression and publishing derivative

works without authorization, in violation of 17 U.S.C. § 501. At no time have Defendants been licensed or otherwise permitted to use the Works at issue in this action.

23. In March of 2024, Plaintiff discovered instances of infringement after watching the "Eras Tour" broadcast over the internet and television. Additional acts of infringement were later discovered in February 2025, and further instances continued to surface even after the filing of the initial Complaint.

24. Defendants have misappropriated, either verbatim or through close paraphrasing, approximately twenty-five to thirty percent of Plaintiff's Works addressing the same subject matter, often within a close temporal window after Plaintiff published those Works.

25. The material copied was integral to Plaintiff's expression. Plaintiff has received recognition for her creative writing, including academic praise for producing a "strong" graduate-level thesis, as well as recognition and awards for her poetry. Defendants' use has adversely affected the potential market for Plaintiff's Works. Prior to Defendants' infringing activity, Plaintiff had received interest from publishers, poetry contests, and literary magazines (Exhibit D).

26. Plaintiff is entitled to recover damages from Defendants' willful infringement, including actual damages and Defendants' profits, or, at Plaintiff's election, statutory damages pursuant to 17 U.S.C. §§ 504 and 505. Plaintiff is further entitled to recover Defendants' profits under 17 U.S.C. § 504(b). Unless enjoined and restrained by this Court, Defendants will continue to infringe Plaintiff's copyrights.

## DEFENDANTS' WORKS AND TIMELINE

27. Between 2019 and 2024, Defendants released and promoted numerous songs and music videos. Plaintiff alleges that Defendants misappropriated protectable expressions from Plaintiff's poems and writings in creating these works.

28. The Complaint sets forth twelve Counts. In several instances, a single Plaintiff poem corresponds to multiple Defendants' songs; in other instances, multiple Plaintiff poems correspond to a single Defendants' song. The following Counts set forth the compositions at issue and the alleged sources of copying.

29. An independent computerized textual analysis further evaluated the strength of the parallels, and its findings differ slightly from Plaintiff's initial assessment. According to this analysis, Counts I, II, III, VII, VIII, and XII show **especially strong indicators** of substantial similarity, while Counts IV, V, VI, IX, X, and XI reflect overlaps with distinctive imagery but may involve expressions less likely to qualify as protectable. The analysis is included solely as a demonstrative aid and does not substitute for the full evidentiary record provided in Exhibits C–F including Plaintiff's original dance routine that Defendant Swift mimicked in the performance of *"Vigilante Sh\*"*, (picture included as evidence and full video is available) and other corroborating evidence of copying.

30. The First Amended Complaint contained a total of 15 Counts but after the analysis and further review, Plaintiff removed her poems *"Black Cat"*(compared to *"Death by a Thousand Cuts"*) and *"Breaking Waves"* (compared to *"Cardigan's Music Video"*) from the Counts Section and placed them as Exhibit F: Patterns of Appropriation (see **Exhibit B**: Computerized Textual Analysis for the full review).

**31. The Twelve Counts** [1]:

- **Count I:** Plaintiff's poem *Ordinary Citizen* contains protectable expressions **substantially similar** to Defendants' song *The Man* (Swift).

- **Count II:** Plaintiff's poem *Whirlwind* contains protectable expressions **substantially similar** to *Who's Afraid of Little Old Me* and *I Can Do It with a Broken Heart* (Swift & Jack Antonoff).

- **Count III:** Plaintiff's poems *Scorpion, Beams of Light, Gaslight, and Innocence Lost* contain protectable expressions **substantially similar** to *My Tears Ricochet* (Swift).

- **Count IV:** Plaintiff's poem *Sky Tinted Water* contains protectable expressions **substantially similar** to *Hoax* (Swift & Aaron Dessner) and *Illicit Affairs* (Swift & Jack Antonoff).

- **Count V:** Poem *Devious Minds* contains protectable expressions **substantially similar** to *Guilty as Sin?* (Swift & Antonoff)

- **Count VI:** Poem *Noah* contains protectable expressions substantially similar *to Clara Bow, Down Bad, and The Manuscript* (Swift & Antonoff).

- **Count VII:** Poem *Stagnate* contains protectable expressions substantially similar to *Right Where You Left Me and It's Time to Go* (Swift & Dessner).

- **Count VIII:** Poem *Delusional Reality* contains protectable expressions similar to those found in *Midnight Rain* (Swift & Antonoff).

---

[1] Plaintiff has also included, for the Court's convenience, the results of a computerized textual analysis that compares Plaintiff's Works with Defendants' lyrics. This analysis, included as Exhibit B, highlights the similarities and supports Plaintiff's contention that the resemblances are substantial and not coincidental. The computerized analysis is offered as a demonstrative aid to supplement the traditional side-by-side comparisons already set forth in the Complaint.

- **Count IX:** Poems *Ingenue* and *Innocence Lost* contain protectable expressions similar to those found in *Robin* (Swift & Dessner).

- **Count X:** Poem *The Fire* contains protectable expressions similar to those found in *The Great War* (Swift & Dessner).

- **Count XI:** Poems *Time* and *Invisible Matter* contain protectable expressions similar to those in *Invisible String* (Swift & Dessner).

- **Count XII:** Plaintiff's introduction to *Fallen* vs. the introduction to *The Tortured Poets Department.* \*Defendants copied the **introductory framing** of your book\*

32. Additional Note (Not Pled as Count): The song *thanK you aIMee* (Swift & Dessner) contains a verse stating that only a few people know who the real "Kim" is. See Exhibits for context.

## LEGAL STANDARD

33. Plaintiff's Amended Complaint sets forth specific, original lines, imagery, and contexts that **go beyond generic metaphors or stock expressions**. These striking similarities constitute protectable expressions under copyright law. The allegations also include detailed access facts showing that Defendants had a reasonable opportunity to view Plaintiff's books, videos, online articles, and social media posts, and other media.

34. The substantial similarity inquiry is typically a **fact issue reserved for the jury, not for resolution at the pleadings stage**. See Calhoun v. Lillenas Publ'g, 298 F.3d 1228 (11th Cir. 2002); Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57 (2d Cir. 2010).

35. In Plaintiff's prior case against Taylor Swift Productions, Inc., the Court reduced Plaintiff's allegations to unprotectable "ideas." However, Plaintiff presented—and continues to present here—detailed line-by-line comparisons, unique historical imagery, and direct visual

parallels that extend **well beyond generic themes**. These satisfy both the extrinsic test (objective comparison of protectable elements) and the intrinsic test (ordinary observer's impression). Copyright does **not** protect ideas, concepts, systems, or methods. It only protects the *original expression* of those ideas once fixed in a tangible medium "17 U.S.C. § 102(b) [source: U.S. Code]." The Plaintiff used her own original and unique "ideas" to write, create, and publish the "Works".

- **Metaphors as Expression:** a *specific, original phrasing* of a metaphor (e.g., a unique poetic line that embodies a comparison in a distinctive way).

- **Not protected:** The general metaphor "time is money." It's too common and lacks originality.

- **Protected:** A distinctive, original metaphor embedded in a poem or song lyrics, where the author's **creative choices in wording, rhythm, and imagery** make it unique. The Plaintiff's Works contain original and creative expressions that have never been used in any other composition, song, poem, or other text. The Defendants try to compare Plaintiff's Works to other musicians, but none are remotely similar.

**Access Allegations Support Plausibility**

36. Unlike the prior complaint, which alleged only "Amazon availability," the Amended Complaint sets forth a concrete distribution record: publication on Amazon; Ingram's worldwide bookstore network; publication by Outskirts Press in which the Plaintiff **invested thousands of dollars to publish and market her books with paid-for widespread distribution;** publication by Ukiyoto Publishers (a publisher who approached the Plaintiff on social media and offered to re-publish her title, *Fallen from Grace*, for free); a press release via IssueWire; an article in Literatura Magazine; and over 9K followers on social media, and more than 300 sales.

37. These facts demonstrate **broad dissemination**, creating a **reasonable opportunity** for Defendants to encounter Plaintiff's works. Courts have held that such widespread internet and bookstore distribution supports access. See Olem Shoe Corp. v. Wash. Shoe Co., 591 F. App'x 873 (11th Cir. 2014).

38. The Plaintiff notes that while the books are not presently being marketed, this does not negate the prior **marketing campaigns during which Defendants had ample opportunity to view and access the Works**.

DEFENDANT'S INFRINGEMENT

39. Even if the Court finds that certain examples cited by Plaintiff do not constitute protectable expression under copyright law, such a conclusion does not preclude Plaintiff's claims in their entirety. Plaintiff has identified and demonstrated numerous instances of protectable expression that Defendants unlawfully incorporated into their songwriting. These examples independently support claims of infringement. Courts have consistently held that a lack of protection for some elements does not defeat a claim where other protectable elements remain. See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1545 (11th Cir. 1996).

40. Defendants infringed Plaintiff's exclusive rights under 17 U.S.C. §§ 106 and 602 by unlawfully copying protectable elements of Plaintiff's Works and publishing derivative works without authorization, in violation of 17 U.S.C. § 501. Defendants have never received any license or authorization to use Plaintiff's Works for any purpose.

41. The misappropriated material includes essential and original elements of Plaintiff's Works. Plaintiff is recognized for her strong writing abilities and creativity, having received

literary awards and academic commendations, including praise from a graduate school professor for a "well-written" thesis.

42. Defendants' unauthorized use has harmed the market potential for Plaintiff's Works. Prior to the infringement, Plaintiff had received expressions of interest from publishers, poetry contests, and literary magazines.

**GENERAL COPYRIGHT ALLEGATIONS (APPLICABLE TO ALL COUNTS)**

43. Plaintiff Kimberly Marasco is the sole author and copyright owner of multiple original literary and artistic works, including:

- *Dealing with a Chronic Illness,* (Outskirts Press, 2018), registered with the U.S. Copyright Office as Reg. No. TXu2-061-218 (2017); and

- *Fallen from Grace* (2019), registered as Reg. No. TXu002200550 (May 27, 2020).

44. These works (the "Works") consist of original poems, a personal memoir, related writings, photographs, and art each fixed in a tangible medium and entitled to **copyright protection under the Copyright Act, 17 U.S.C. §§ 101 et seq.**

45. Plaintiff owns the exclusive rights granted by 17 U.S.C. § 106, including the rights to reproduce, distribute, perform, display, and create derivative works.

46. Defendants Taylor Swift, Aaron Dessner, Jack Antonoff, Republic Records, and Universal Music Group (collectively, "Defendants") copied original, protectable expression from Plaintiff's Works and incorporated it into their songs, lyrics, and audiovisual content, without authorization.

47. Defendants' actions—copying, reproduction, distribution, and public performance—violate Plaintiff's exclusive rights under 17 U.S.C. §§ 106 and 501.

48. Plaintiff is entitled to recover all damages caused by Defendants' willful infringement, including actual damages, profits, and attorney's fees pursuant to 17 U.S.C. §§ 504 and 505. Alternatively, Plaintiff may elect to recover statutory damages under 17 U.S.C. § 504.

49. The substantial similarities between Plaintiff's Works and Defendants' songs are not coincidental, but evidence unlawful copying of protectable expression.

50. As a direct and proximate result of the infringement, Plaintiff has suffered damages and is entitled to all available remedies under the Copyright Act, including actual or statutory damages, disgorgement of profits, injunctive relief, and costs.

51. Unless enjoined by this Court, Defendants will continue to infringe Plaintiff's copyrights by copying or creating derivative works from Plaintiff's original poems and verse.

**Count I**

**Copyright Infringement of "*Ordinary Citizen*"**

**(17 U.S.C. §§ 106, 501)**

By Plaintiff Against Defendants

Plaintiff incorporates by reference the General Copyright Allegations

(¶¶43–51) as if fully set forth herein.

52. Ordinary Citizen is part of Plaintiff's book <u>Dealing</u> (2018), published by Outskirts Press. Plaintiff owns the exclusive rights under 17 U.S.C. § 106 to copy, distribute, perform, and create derivative works of her poem. Defendants infringed these rights by creating the song and video *The Man* (Lover, 2019), which copies Plaintiff's protectable expressions.

53. Plaintiff's poem *Ordinary Citizen* includes verses including:

**"I'm running behind/You say it's His word against mine/No one will listen/Because I'm only an ordinary citizen/So you tell me I'm guilty before committing a crime/I**

try to fly like a butterfly/But my wing was clipped by his lip…/Power only resides in my mind/as its His word against mine/After the sun sets/the earth is nothing but a dark shadow/Light remains in the Afterglow" (For contextual pattern: Defendants song *Afterglow* was also produced after the Plaintiff's poem was published)

54. Defendants used an **identical protectable expression** (albeit switching out a few words for other similar ones) to come up with a strikingly similar, powerful and memorable expression in Defendant's song which include:

"**I'm so sick of running as fast as I can / wondering if I'd get there quicker if I was a man… when everyone believes ya, what's that like?**"

55. Echoing Plaintiff's:

"**I'm running behind, it's His word against mine" (which also insinuates that everyone will believe the male over the woman**) and that her wing (freedom) was clipped by his lip (the Man's voice is stronger than hers).

56  Plaintiff's poem, *Ordinary Citizen* reveals **sequenced expressions** (running behind → word against mine → power in mind) create a protectable "net impression" of a rigged-race system.  The song is not a general song about men being more powerful than women across all industries, but rather, specifically relates to an office setting where a boss oversees a female worker and employs a **rigged-race metaphor** ("running behind"), identifies the narrator as an "ordinary citizen," and includes imagery of a naïve female working in a male-dominated office environment. The overlap lies in the specific expressive choices and lyrics compared to the poem's verses, not in the general idea of sexism.

57. To continue Defendant's lyrics, the Defendant sings,

"And I'm so sick of **them coming at me again**… / **Could all be separated from my good ideas and power moves**… / which echoes Plaintiff's protectable expression that "**power only resides in her mind**" (because only the Man can have power).

58. Defendants also used the distinctive narrative device of a silenced female worker navigating a patriarchal corporate system—exactly the context Plaintiff expressed in *Ordinary Citizen.*

59. Defendant's comparisons to Beyoncé's *If I Were a Boy* and Chaka Khan's *A Woman in a Man's World* are misplaced. Beyoncé's song addresses relational empathy, not systemic corporate inequity, and does not share Plaintiff's unique expressions. Khan's lyrics, set in the entertainment industry, likewise lack the specific imagery and contextual overlap present between *Ordinary Citizen* and *The Man.*

- **Exhibit A-1: Copyright Registration for *Ordinary Citizen***
- **Exhibit C-1: Full text of poem**

**Count II**

**Copyright Infringement of "*Whirlwind*"**

**(17 U.S.C. §§ 106, 501)**

By Plaintiff Against Defendants

Plaintiff incorporates by reference the General Copyright Allegations

(¶¶43–59) as if fully set forth herein.

60. *Whirlwind* is part of Plaintiff's collection <u>Dealing</u> (2018), published by Outskirts Press. Plaintiff owns the exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, perform, and prepare derivative works of her poem. Defendants infringed these rights by creating songs and

videos that copied the unique expressive elements of *Whirlwind* in their songs *Fortnight and Who's Afraid of Little Old Me?*

61. The Defendants' *Fortnight* video depicts asylum-like imagery, invoking themes of confinement and silencing. The **rare historical reference** to Nellie Bly, combined with nearly identical phrasing around being "caged" and called "crazy," constitutes protectable expression—not merely a generic theme. Plaintiff's history major educational background further grounds her unique use of historical figures in her poetry writings and support a pattern of copying by the Defendant.

62. Plaintiff's poem *Whirlwind* (2018) references Nellie Bly, institutionalization, and the injustice of being confined and then labeled "crazy." The poem also links this experience to retaliation, chaos, survival and **love within a "whirlwind."**

63. Defendants mirrored these elements. In *Who's Afraid of Little Old Me?* (2024), Swift uses the **exact protectable expression:**

> **"you caged me and told me I'm crazy,"**

64. Paired with imagery of institutionalization and abandonment, the *Fortnight* video depicts Swift dressed and acting in the likeness of Nellie Bly, seated at a typewriter as asylum visuals unfold—closely paralleling Plaintiff's poem. The overlap in phrasing, historical reference, and visual depiction cannot reasonably be dismissed as coincidence.

65. While Defendants frame 'Fortnight' as a fleeting romance of fourteen days, Plaintiff's poem explicitly references Nellie Bly's *Ten Days in a Mental Institution*, a work Swift visually echoes by portraying herself as a writer confined within an institution.

66. Plaintiff's poem states:

"**They caged me and told me I'm crazy** / No one would have believed Nellie Bly / Until she went undercover and revealed their lies / Now I'm standing in the midst of a whirlwind / Chaos all around me / Under investigation / Once again, I feel the coy tricks of retaliation… / **But I know it's you and you alone** / **Who will make what you are** / I will continue to fight thru the storm."

Plaintiff describes how the female knows she, herself, created this reality (which the Defendant echoes in the verse **"But my bare hands paved their path"**.

67. Defendants' *Who's Afraid of Little Old Me?* includes:

"The who's who of 'Who's that?' is poised for the attack / **But my bare hands paved their path** / **You caged me and told me I'm crazy** / If you wanted me dead…"

68. This constitutes a strikingly similar treatment: both works portray a woman confined, silenced, and gaslighted, **using the same uncommon phrase**.

69. Further, Plaintiff's poem emphasizes **creative resilience**:

"**What I found is that when you write from your heart, it results in a work of art.**" Defendants echoed this unique expression in *I Can Do It With a Broken Heart*: "**I cry a lot but am so productive, it's an art… I can even do it with a broken heart.**" Both convey the idea of transforming adversity into art through writing and productivity, and this constitutes a **protectable expression.**

70. **Defendants' repeated appropriation of Plaintiff's imagery, phrasing, and historical references**—including direct parallels to Nellie Bly—demonstrates copying of protectable expressions rather than reliance on unprotectable general ideas.

- **Exhibit A-1: Copyright Registration for *Whirlwind***

- **Exhibit C-2: Full text of poem**

**Count III**

**Copyright Infringement of "*Scorpion, Beams of Light,***

***Gaslight,* and *Innocence Lost*"**

**(17 U.S.C. §§ 106, 501)**

By Plaintiff Against Defendants

Plaintiff incorporates by reference the General Copyright Allegations

(¶¶43–70) as if fully set forth herein.

71. *Scorpion, Beams of Light, Gaslight, and Innocence Lost* are part of Plaintiff's collection Dealing (2018). Plaintiff holds the exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, and prepare derivative works of her poems. Defendants infringed these rights by creating *My Tears Ricochet* using substantial and protectable expressions from Plaintiff's works.

72. Both Plaintiff's poems and Defendants' lyrics employ uncommon imagery of tears as weapons or reflections, paired with spiritual inversions (heaven vs. hell), and metaphors of destruction through water and fire. These distinctive sequences demonstrate copying of **expressions,** not reliance on general ideas.

73. In *Scorpion*, Plaintiff wrote:

> **"No apologies can remove the tears / When you're no longer here"**

> **"Until I heard your laughter from above (from heaven)… and your words echoing: this is nothing but a sh\*\* show."**

74. Defendants echoed this with:

> **"She's laughing up at us from Hell"**

75. Both works juxtapose laughter with spiritual inversion, which is a protectable expression.

76. In *Beams of Light.* Plaintiff wrote about the souls lost on 9/11:

**"Where the souls of the innocence ascended… / Only the innocent souls were accepted / The dark evil entity devoured in the fire / Doves dancing and singing high in the sky/and I can hear the beautiful choir"**

77. Defendants similarly wrote:

**"And I still talk to you (when I'm screaming at the sky)."**

78. Both employ imagery of souls rising upward and communication with the deceased. Plaintiff's personal background as a flight attendant during 9/11 further grounds her unique expression.

79. In *Innocence Lost.* Plaintiff wrote:

**"I caught your tear in my hand, and I fear, you're drowning in your own reflection."**

80. The Defendants rephrased what the Plaintiff wrote in saying "my tears ricochet (reflect) back to the person crying. The Plaintiff wrote about catching a single tear drop insinuating that her lover is trying to conceal his sadness but the pain the lover caused is also being reflected unto himself. He is not only causing her pain, but pain for himself. This is a very powerful part of the Plaintiff's poem in which the Defendants mirrored in writing:

Defendants wrote:

> **"And if I'm dead to you, why are you at the wake? /** …And I can go anywhere I want / Anywhere I want, just not home / …**My tears ricochet."**

81. The **"tears reflecting back"** vs. **"tears ricocheting"** are near-identical metaphors—both **unusual, striking,** and **protectable.** Furthermore, in *Fallen from Grace*, the Plaintiff wrote about **attending a friend's funeral.**

82. The Plaintiff's poem, *"Gaslight"*, includes the text:

> "You're taunting me/ claiming its all for fun/**A coward hides behind a gaslight/Stealing positive energy**/Nowhere to run or hide/Unable to escape this tormentor…/When it's obvious they are deliberately making me look crazy**…/When the seven seas rise in anger/All the resources will be submerged under water**/There will be nothing left in sight/This was the result of your Gaslight/"

83. Defendants paralleled this destructive water imagery with:

> ""I didn't have it in myself to go with grace/**And so the battleships will sink beneath the waves / You had to kill me, but it killed you just the same."** Both use water as a metaphor for **mutual destruction**, with imagery of submersion and loss.

84. Additionally, Plaintiff wrote:

> **"Every gaslight has a gas leak, you set off the fuse…"**

Defendants echoed this causation imagery with:

> **"The touch of a hand lit the fuse."**

85. Both works describe an instigator setting off an explosive chain of events, again in nearly **identical, protectable expressions.**

**86.** The Defendants used the same unique expressions of being "submerged" under water **causing harm to each other**. The Plaintiff wrote about a battle between two people (on water which represents life for everything that exists) where nothing will be left and that both will end up destroying each other.

**87.** Also, the Plaintiff was a flight attendant during the tragic 9/11 event which inspired the poem, "*Beams of Light*" written by the Plaintiff. One of the chapters in the Plaintiff's book, "Fallen from Grace", compares the **loss of jewelry** to being an **omen to future loss** the Plaintiff endured. The Defendants used the same theme in their song, "*My Tears Ricochet*", in stating how she **buried someone with jewelry** she bought them.

Finally, Plaintiff's poem, *Gaslight,* includes the verse:

**"Create a masterpiece with your engineering mind."**

**88.** Plaintiff later reinforced this motif in a separate poem referencing Elon Musk as a mathematical equation with stating **Elon=MC$^2$**

**89.** Defendants echoed this unique framing of people as equations in *Mastermind* (2022):

**"To assess the equation of you."**

**90.** This repeated overlap across multiple works strengthens the inference of copying.

- **Exhibit A-1: Copyright Registration for *Scorpion, Beams of Light, Gaslight, and Innocence Lost***
- **Exhibit C-3: Full text of poems**

## Count IV

### Copyright Infringement of "*Sky Tinted Water*"

### (17 U.S.C. §§ 106, 501)

By Plaintiff Against Defendants

Plaintiff incorporates by reference the General Copyright Allegations

(¶¶43–90) as if fully set forth herein.

91.  Plaintiff's collection Fallen (2020) includes the poem *Sky Tinted Water*. Plaintiff owns the exclusive rights under 17 U.S.C. § 106 to copy, distribute, and prepare derivative works of her poems. Defendants infringed these rights by creating the songs *Hoax* and *Illicit Affairs* using protectable expression derived from *Sky Tinted Water*. The visual and textual overlaps between Plaintiff's poem *Sky Tinted Water* and Defendants' songs *Hoax and Illicit Affairs* reinforce Plaintiff's claim of copyright infringement.

92.  Plaintiff's poem contain protectable expressions:

**"Will you show me how to complement the sky?"**—an original metaphor equating love with the beauty and **vastness of the sky.**

93.  Defendants' lyrics, "**I made you my temple, my mural, my sky**" (*Illicit Affairs*) similarly elevate a person to the level of the sky, demonstrating substantial similarity in unique expressive choices.

94.  Plaintiff's poem states:

**"Sky Tinted Water / Your love is crystal clear… / Thought love would lead the way / Then I saw your reflection / And falsely led astray / I'm trying not to cry / Will you show me, how to complement the sky?"**

95. Defendants' *Hoax* (2020) includes the lyric:

**"Your faithless love is the only hoax I believe in."**

This parallels Plaintiff's line about being "falsely led astray," both describing a betrayal

**in which the narrator was deceived into believing in false love.**

96. Defendants' *Illicit Affairs* (2020) includes:

**"You showed me colors you know I couldn't see with anyone else."**

**"I made you my temple, my mural, my sky."**

97. These lyrics closely mirror Plaintiff's unique protectable expression,

**"Will you show me how to complement the sky?"** Both elevate the beloved to a

cosmic dimension, entwining love with the imagery of the sky.

98. Plaintiff's use of sky imagery is deeply personal, rooted in her experiences as a flight

attendant capturing skies in photographs (Exhibit B). Defendants' rephrasing of this verse

demonstrates not coincidence, but appropriation of Plaintiff's distinctive expression.

99. In the previous complaint, the Defendants compare the poems to Elton John's, *"Candle

in the Wind"* but this song is completely different and doesn't use similar expressions. In *"Sky

Tinted Water"*, the Plaintiff is searching for love which the Defendants wrote in a similar way to

describe the same situation.

- **Exhibit A-2: Copyright Registration for the poem, *Sky Tinted Water***

- **Exhibit C-4: Text of poem**

**Count V**

**Copyright Infringement of "Devious Minds"**

**(17 U.S.C. §§ 106, 501)**

By Plaintiff Against Defendants

Plaintiff incorporates by reference the General Copyright Allegations

(¶¶41–99) as if fully set forth herein.

**100.** *Devious Minds* is part of Plaintiff's collection <u>Dealing</u> (2018), published by Outskirts Press. Plaintiff owns the exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, perform, and prepare derivative works of her poem. Defendants infringed these rights by creating songs that were derived from the unique expressive elements of *Devious Minds* with *Guilty as Sin?*.

**101.** *Devious Minds* references Annie Oakley's mistreatment by the press, describing defamatory publicity as a **"pernicious disease"** and portraying Oakley's resilience.

**102.** The Plaintiff's poem, "*Devious Minds*", include the verse:

**Who are the shifty and the crooked? When we look in the mirror /Do we see a reflection of our wrongdoing and transgressions? How are we devious? When the world we live in is nothing other than a crime? Are we going astray from the normal way? Or is it just a figment of my imagination? What is devious, if devious is the design?**

**103.** The Defendant sings:

**I'm seeing visions, am I bad? Or mad? Or wise? ...Only in my mind?... How can I be guilty as sin?**

104. These two compositions are nearly **written exactly the same**, using striking similar verbiage and tone.

105. The Plaintiff's poem, *"Devious Minds"*, questions thoughts about the world and whether or not she is devious as it could all just be a **"figment of [her] imagination"** because she questions reality.

106. "Defendants' song *"Guilty as Sin?"* employs the same protectable expression of questioning one's own guilt while simultaneously imagining scenarios that may exist only in the mind. Plaintiff's work contains an original expression exploring feelings of guilt and uncertainty, which Defendants appropriated in their songwriting.

107. The Plaintiff's verse in *Devious Minds*:

> **"Its easy to blame and find fault/ Easy to accuse and abuse /I know it began before Annie Oakley/ But when the papers got a hold of her name /It was a pernicious disease running through the tabloids /Oh, but Annie didn't freeze /The next thing she did, she fought with pride /And the defamatory statements seemed to subside."**

108. The Defendant's song, "Clara Bow", includes the lines:

> **"You look like Clara Bow in this light /All your life, did you know? Youd be picked, like a rose"**

109. Defendant's song continued…

> **"The crown is stained but you're the real queen Flesh and blood amongst war machines"**

110. The Defendants paraphrased what the Plaintiff wrote. Also, the Defendants' song is about a known figure from the early 20th century, and she is being written about in the tabloids. The Plaintiff's poem describes how Annie Oakley was painted in a **negative light** by the media.

The Defendant uses Clara Bow and how she's portrayed negatively by those "in town", yet she's "the real thing".

- **Exhibit A-1: Copyright Registration for *Devious Minds***
- **Exhibit C-5: Text of poem**

**Count VI**

**Copyright Infringement of "Noah"**

**(17 U.S.C. §§ 106, 501)**

By Plaintiff Against Defendants

Plaintiff incorporates by reference the General Copyright Allegations

(¶¶41–110) as if fully set forth herein.

**111.** Plaintiff wrote the poem and song, *Noah*. Evidence of its creation and adaptation into song in May of 2023 (Prior to Defendant's songs in April of 2024) independently verifies Plaintiff's authorship. Plaintiff holds the exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, and prepare derivative works of her poems.  Defendants infringed these rights by creating songs *including Clara Bow, Down Bad, and The Manuscript*, which contain protectable expressions derived from *Noah*.

**112.** *Plaintiff's poem* and *song Noah* states:

> **"Satan sends his angels / Deception in flesh and blood / Noah built a starship / To escape the red flood."**

**113.** *Clara Bow* uses nearly identical imagery:

> **"Flesh and blood amongst war machines / You're the new god we're worshipping."**

Both works employ apocalyptic imagery of flesh, blood, and divine deception. *Noah* depicts **catastrophic floods and escape through a starship.**

**114.** *Down Bad* parallels this imagery:

**"Down bad, waking up in blood / Staring at the sky, come back and pick me up."**

**Both works use biblical/apocalyptic imagery (blood, sky, escape) to portray**

**devastation and the need for deliverance.**

**115.** *Noah* also includes:

**"We need to come together like musical notes to poetry."** *The Manuscript* echoes this

with: **"Tears fell in synchronicity with the score."**

**116.** Both works equate emotional experience with musical and poetic imagery, reinforcing

Plaintiff's original connection of writing and music. Also, the Plaintiff drew a sketch of **musical**

**notes next to a quill pen** (to represent 1800's style of writing to coincide with music) for the

cover of her book, *Songs of the Unsung*, indicating the process of writing simultaneously creates

other art, such as music.

- **Exhibit A-3: Copyright Registration for** *Noah*
- **Exhibit C-6: Text of poem**

**Count VII**

**Copyright Infringement of the poem** *"Stagnate"*

**(17 U.S.C. §§ 106, 501)**

By Plaintiff Against Defendants

Plaintiff incorporates by reference the General Copyright Allegations

(¶¶41–116) as if fully set forth herein.

**117.** Plaintiff's collection <u>Fallen</u> (2018) includes the poem *Stagnate.* Plaintiff holds the

exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, and prepare derivative works of

her poems. Defendants infringed these rights by creating the songs *Right Where You Left Me and It's Time to Go* (2021), which contain protectable expressions derived from *Stagnate.*

118. In *Stagnate,* Plaintiff wrote:

> **"It's time to go / When will you let me go? / I continue to drive forward, but you won't let me go… I remain stagnate in this light."**

In her poem *Scorpion*, Plaintiff likewise expressed: *"I waited at the bar / Didn't know by then you were gone too far."*

119. Defendants' lyrics mirror these distinctive phrases and imagery, including *"It's time to go"* (*It's Time to Go*) and *"I'm still at the restaurant, right where you left me"* (*Right Where You Left Me*).

120. Both Plaintiff's poems and Defendants' songs employ the uncommon device of situating the speaker in a public setting (bar/restaurant) as a metaphor for emotional abandonment, coupled with the refrain *"It's time to go."*

121. For further context, Defendants state *"You look like Clara Bow in this light"* (*Clara Bow*). This parallels the theme in *Stagnate*, where Plaintiff described being perceived not for who she truly is, but as an image constructed by another—remaining "stagnate" in their eyes even as she grows and moves further away. This symbolic meaning extends beyond the literal words and reinforces the substantial similarity of expression.

122. This is not a generic theme but **a specific expressive device:** equating immobility **(stagnation) and waiting in a place of social gathering with being stranded emotionally, unable to move forward.** Plaintiff's original phrasing and metaphor were appropriated by Defendants in both lyrical and thematic form.

- **Exhibit A-1: Copyright Registration for *Stagnate***

- **Exhibit C-7: Text of poem**

## Count VIII

### Copyright Infringement of poem *"Delusional Reality"*

### (17 U.S.C. §§ 106, 501)

By Plaintiff Against Defendants

Plaintiff incorporates by reference the General Copyright Allegations

(¶¶41–122) as if fully set forth herein.

123.  Plaintiff's collection <u>Dealing</u> (2018) includes the poem *Delusional Reality*. Plaintiff holds the exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, and prepare derivative works of her poems. Defendants infringed these rights by creating the songs *Midnight Rain (2022) and Long Story Short* (2020), which contain protectable expressions taken from *Delusional Reality*.

124.  Plaintiff's poem includes the following verses:

**"Drowning in my storm, waves crash the shore" and "With the clouds I rain, the smog consumes me."**

125.  These lines present a distinctive device: the narrator becomes the storm itself—embodying rain, clouds, and waves—rather than merely being caught within a storm. This expressive transformation is an original and protectable expression.

126.  Defendants' lyrics mirror this **uncommon usage.** *In Midnight Rain,* Swift writes:

**"I was midnight rain."** and in *Long Story Short*, she writes:

**"My waves meet your shore."**

**127.** Both adopt the same unusual perspective: the speaker is not surrounded by weather or water, but is the storm, rain, or ocean itself. Plaintiff's phrase:

**"(my) waves crash the shore"** is directly echoed in Defendants' **"my waves meet your shore."**

**128.** Plaintiff's poem—and Defendants' later songs—use the unique device of the narrator identifying as the storm or rain itself, consumed by **her own turmoil, rather than describing someone else** (such as being a mix of a storm and sunshine as noted in Brad Paisley's Perfect Storm.

**129.** The recurrence of these same metaphors across Plaintiff's work and Defendants' lyrics—particularly the rare device of becoming the storm—constitutes substantial similarity and supports Plaintiff's claim of copyright infringement.

- **Exhibit A-1: Copyright Registration for *Delusional Reality***
- **Exhibit C-8: Text of poem**

**Count IX**

**Copyright Infringement of poems *"Ingenue"* and *"Innocence Lost"***

**(17 U.S.C. §§ 106, 501)**

By Plaintiff Against Defendants

Plaintiff incorporates by reference the General Copyright Allegations

(¶¶41–129) as if fully set forth herein.

**130.** Plaintiff's collection *Dealing* (2018) includes the poems *Ingenue and Innocence Lost.* Plaintiff holds the exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, and prepare derivative works of her poems. Defendants infringed these rights by creating the song *Robin* (2023), which contains protectable expressions drawn from *Ingenue and Innocence Lost.*

**131.** Defendants' *Robin* depicts a young girl whose innocence and imagination are juxtaposed with the adult recognition that she will face a cruel world but will learn resilience. The Defendants wrote,

> **"The time will arrive for the cruel and the mean. You'll learn to bounce back just like your trampoline." "You're an animal, you are bloodthirsty / Way to go, tiger."**

**132.** Plaintiff's *Innocence Lost* parallels this theme, warning of the harshness awaiting a child:

> **"I wonder what she thinks of the world, if she only knew, it would turn mean and cruel."**

**133.** In *Ingenue*, Plaintiff writes: **"Just an ingenue, viewing the world as it is new / A girl once hungry, lost to starvation / of a cub who grew into a lion."**

**134.** Both Plaintiff's poems and Defendants' lyrics use the child-to-animal transformation metaphor (cub to lion / tiger) to show innocence giving way to strength, and both highlight the need for protection during the transition from childhood to maturity.

**135.** Additionally, (added as a pattern) Defendants' earlier song *Nothing New* includes the line: **"Everyone loves an ingenue,"** further mirroring Plaintiff's distinctive use of that rare term as a title and theme.

- **Exhibit A-4: Copyright Registration for *Ingenue***
- **Exhibit C-9: Text of poem**

**Count X**

**Copyright Infringement of the poem "*The Fire*"**

**(17 U.S.C. §§ 106, 501)**

By Plaintiff Against Defendants

Plaintiff incorporates by reference the General Copyright Allegations

(¶¶41–135) as if fully set forth herein.

136.  Plaintiff's collection Fallen (2019) includes the poem *The Fire*. Plaintiff holds the exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, and prepare derivative works of her poems. Defendants infringed these rights by creating *The Great War* (2022), which contains protectable expressions taken from *The Fire*.

137.  In *The Fire*, Plaintiff wrote:

> **"Anger fuels our desire / I'm fighting fire with fire / …Pick your battles wisely, they say."**

138.  Defendants' *The Great War* includes:

> **"Diesel is desire, you were playing with fire."/ "Now I breathe fire each time we talk/ "Pick your battles until the battles pick you".**

139.  Both Plaintiff's and Defendants' works rely on the uncommon metaphor of desire as fuel and fire as both weapon and consequence in a conflict between lovers. Plaintiff's original expression—equating anger with the fuel that ignites destructive desire—is mirrored in Defendants' phrasing, which substitutes "diesel is desire" for "fuels our desire" but conveys the same protectable expression.

140.  This parallel demonstrates not merely shared themes of conflict, but copying of Plaintiff's distinctive figurative device, supporting a finding of substantial similarity.

- **Exhibit A-2: Copyright Registration for** *The Fire*

- **Exhibit C-10: Text of poem**

**Count XI**

**Copyright Infringement of "*Invisible Matter*" and "*Time*"**

**(17 U.S.C. §§ 106, 501)**

By Plaintiff Against Defendants

Plaintiff incorporates by reference the General Copyright Allegations

(¶¶41–140) as if fully set forth herein.

141. Plaintiff authored the poems *Invisible Matter* and *Time*, both included in her collection Dealing (2018). Plaintiff holds the exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, and prepare derivative works of her poems. Defendants infringed these rights by creating the song *Invisible String* (2020), which contains protectable expressions substantially similar to *Invisible Matter* and *Time*.

---

**A.  *Invisible Matter* vs. *Invisible String***

142. Plaintiff's poem *Invisible Matter* includes:

> **"She is invisible, she hears the laughter and the cry, she sees the beauty and the pain/ she knows everything but reveals not a thing, sometimes she is warm but can turn cold in an instant/ she can stir up a storm and become voracious/She's always by my side whispering in my ear and knowing my deepest thoughts/she travels far and reaches high/**She goes thru your soul and entwines your hair, she will always be there as we grow/absorbing the rain and turning it into beautiful rainbows".

143. The Defendants' song discusses being led by an invisible power, bringing both good and bad things which resemble what the Plaintiff wrote. Plaintiff's poem personifies an unseen, guiding presence—simultaneously warm and cold, able to stir storms, whisper truths, and bind itself to human experience. Defendants' *Invisible String* parallels this by describing an unseen force that invisibly ties two people together, bringing both hardship and salvation:

144. The Defendants' lyrics include

> **"All along there was some invisible string tying you to me... A string that pulled me out of all the wrong arms, right into that dive bar."**

145. Both works center on an unseen force but constant presence—an invisible force entwined with the individual's life, carrying both joy and pain. Defendants' song **appropriates this expressive device rather than using a generic theme of fate or destiny.**

---

**B. Time vs. Invisible String**

Plaintiff's poem *Time* includes:

> **"Time, what is time? All I know, it's never been kind."**

Defendants' *Invisible String* mirrors this with:

> **"Time, mystical time, cutting me open then healing me fine."**

146. Both works personify time as a mysterious, almost sentient force capable of cruelty ("never been kind" / "cutting me open") and, paradoxically, of restoration ("healing me fine"). The Defendants' phrasing is not merely similar in theme but **rearticulates Plaintiff's original expression with only minor word substitutions.**

147. The Defendants used the same words to convey the same meaning, questioning time (time is mystical—mysterious) and that Time can hurt "never been kind" and "cutting me open".

The **Defendants rephrased the Plaintiff's poem,** using the same words but changing a few here and there to express the same exact unique and protectable expression.

---

**148. Additional Parallels**

Defendants' *Invisible String* also includes:

> **"Gold was the color of the leaves."**

Plaintiff's poem *Ingenue* (also from *Fallen*) contains a closely similar line:

> **"When leaves become gold."**

This repeated use of distinctive imagery further demonstrates Defendants' access to and copying of Plaintiff's works.

---

**149.** The cumulative similarities—an invisible force entwining human lives (*Invisible Matter* vs. *Invisible String),* time as both cruel and healing (*Time vs. Invisible String),* and the mirrored imagery of golden leaves (*Ingenue vs. Invisible String)*—support a finding of **substantial similarity in protectable expressions,** not merely shared ideas.

- **Exhibit A-1: Copyright Registration for *Time* and *Invisible Matter***
- **Exhibit C-11: Text of poems**

## Count XII

## Copyright Infringement of the Introduction to "Fallen" (2019)

## (17 U.S.C. §§ 106, 501)

By Plaintiff Against Defendants

Plaintiff incorporates by reference the General Copyright Allegations

(¶¶41–149) as if fully set forth herein.

150. Plaintiff authored Fallen (2019), an original literary work consisting of both a novel and a collection of poems. The introduction to *Fallen* is part of the copyrighted work. Plaintiff holds the exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, and prepare derivative works of her writings. Defendants infringed these rights by composing the introduction to *The Tortured Poets Department* (2024), which is substantially similar to the protectable expression from Plaintiff's introduction to Fallen.

151. Plaintiff's Fallen introduction states:

> **"This anthology combines Kimberly's poetry written throughout the years reflecting the times and a previously published book titled, '*Fallen from Grace*'. The writing was inspired by societal issues, personal challenges of anxiety and fear to expressions of hope and dreams."**

152. Defendants' *The Tortured Poets Department* introduction similarly states:

> **"An anthology of new works that reflect events, opinions and sentiments from a fleeting and fatalistic moment in time — one that was both sensational and sorrowful in equal measure."**

- **Exhibit A-2: Copyright Registrations for the introduction to Fallen**

- **Exhibit C-12: Text of introduction to Plaintiff's published book**

153. Both introductions frame the work as an anthology of writings reflecting their era, inspired by personal and societal struggles, and expressed through a blend of hardship and hope. Defendants' phrasing is striking similar to Plaintiff's protectable structure and expression, merely substituting synonyms to write the same, unique, expression.

154. These similarities go beyond the unprotectable idea of introducing an anthology. Defendants copied the original mode of expression in Plaintiff's introduction—its thematic framing of poetry as reflections of time, society, and personal struggle—and repackaged it with minor variations. Such paraphrasing constitutes infringement under 17 U.S.C. §§ 106 and 501.

## CONCLUSION

155. List of Exhibits A—F:

- **Exhibit A** (A-1 through A-4) contains the copyright registrations for the Works.

- **Exhibit B** provides the AI analysis.

- **Exhibit C** (C-1 through C-12) includes text of the poetry

- **Exhibit D** sets forth additional patterns of appropriation, including poems not separately pled in the counts section.

- **Exhibit E** contains artwork, photographs, and other supporting images.

- **Exhibit F** provides a chart correlating page numbers with the poems and text.

156. "Substantial similarity" exists where the accused work is so similar to the Plaintiff's work that an ordinary reasonable person would conclude the Defendant unlawfully appropriated the Plaintiff's protectable expressions by taking material of substance and value (Stromback v. New Line Cinema, 384 F.3d 283, 297, 6th Cir. 2004). In such cases, courts examine similarities in theme, characters, plot, sequence, pace, and setting. Williams v. Crichton, 84 F.3d 581, 588 (2d Cir. 1996).

157. Ultimately, the inquiry is whether, based on the "net impression" of the works' expressive elements, the ordinary lay observer would find them substantially similar.

158. In Kearns v. Ford Motor Co., 726 F. Supp. 159 (E.D. Mich. 1989): Robert Kearns, the inventor of the intermittent windshield wiper, sued Ford and Chrysler for copying his invention. On cross-examination, Kearns (litigated pro se), had Ford's expert read the opening paragraph of Charles Dickens' "*A Tale of Two Cities,*" after which he had to admit that Dickens had not **created any of the words** he used in that famous paragraph, but that the artistry came in how those **words were put together**.

159. Kearns demonstrated that originality lies not in individual words but in their creative arrangement of **words used together in sequence to create distinctive visual images** just like in Dicken's lines: *"It was the best of times, it was the worst of times, it was the age of wisdom, it was the age of foolishness..."* When you compare the words in context of the entire passage, you get a distinctive imagery that will be remembered.

160. Defendants previously argued that Plaintiff's text contains uncopyrightable metaphors. This is incorrect. Plaintiff did not rely on metaphors or common phrases. Metaphors compare two independently real things (e.g., "she sings like a lark"). Short phrases such as names, titles, or slogans are likewise uncopyrightable. Plaintiff's writings, however, consist of complete sentences with subjects and predicates, conveying original, unique, never been written before, and **protectable expressions**.

161. As the Copyright Society explains: "The words you use to tell a story, the picture that you paint, and the lyrics to a song [or poem] you wrote are all types of 'expression.' Until you set these things down on paper or in a recording, they are nothing more than ideas."

162. Plaintiff also submitted a photograph of a dance sequence, not included in the Counts section, solely to provide additional evidence of copying. Plaintiff does not claim infringement regarding her poetry about Nellie Bly, but passages and images of Nellie Bly are included in the Exhibits to further demonstrate copying.

## FACTS

163. Plaintiff owns valid copyright registrations for The Works. Defendants had access to The Works, which were publicly available for sale online. Defendants were never licensed or authorized to use The Works for any purpose.

164. Defendants' infringing acts include, but are not limited to, creating, recording, manufacturing, producing, selling, licensing, marketing, and distributing musical compositions and sound recordings of the songs identified in the Counts section.

165. Defendants infringed Plaintiff's exclusive rights under 17 U.S.C. §§ 106 and 602 by creating derivative songs, distributing copies, and publicly performing them online and in concerts without authorization, in violation of 17 U.S.C. § 501.

166. Defendants misappropriated Plaintiff's **unique and creative expressions**, copying protectable elements without permission.

167. The scope of Defendants' copying precludes independent creation, coincidence, or reliance on a common source. The portions taken comprise protectable expressions of such importance that the appropriation is actionable.

168. Plaintiff never authorized Defendants to copy or prepare derivative works. Defendants profited by distributing and performing the infringing works in this District. Their acts were willful, intentional, and in disregard for Plaintiff's rights.

169. Defendants have exploited, and continue to exploit, Plaintiff's works in this District, the State of Florida, throughout the United States, and worldwide by reproducing, preparing derivative works, distributing, licensing, and publicly performing them.

170. Defendants have profited substantially, collecting and retaining royalties and fees from the infringing works without remitting any portion to Plaintiff. They should be held jointly and severally liable for all profits derived from their infringing activities.

171. As a result of Defendants' willful infringement, Plaintiff is entitled to maximum statutory damages under 17 U.S.C. § 504(c), or, at their election, actual damages and profits under § 504(b), as well as other costs under § 505.

172. Defendants' conduct has caused, and unless enjoined will continue to cause, irreparable harm not compensable by money damages. Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiffs are entitled to injunctive relief prohibiting further infringement.

173. Defendants' infringement occurred contemporaneously with Plaintiff's prior publications and involved the same subject matter, using Plaintiff's unique and unprecedented expressions that had already gained recognition among publishers, literary magazines, and contests. Plaintiff's rights, secured through copyright registration, were violated. Defendants' conduct constitutes unlawful appropriation of Plaintiff's copyrighted material.

## CAUSE OF ACTION

174. Defendants' reproduction, distribution, and sale of the infringing works—including the *Lover book, Folklore, Midnights, and The Tortured Poets Department*—in the United States and abroad continue to this day. Defendants have not compensated Plaintiff for their use of her copyrighted works. Defendants' reproduction, distribution, licensing, merchandising, and commercial exploitation of these albums, including their use in the "Eras Tour," and their authorization of others to do the same, infringe Plaintiff's exclusive rights under the Copyright Act.

175. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered and continues to suffer irreparable harm. These injuries are ongoing and will not abate absent judicial intervention. Defendants' reproduction and release of the infringing Works were wholly unauthorized, undertaken without license or consent, and have generated unlawful revenues. Pursuant to 17 U.S.C. § 504(c), Plaintiff is entitled to statutory damages because the infringement occurred after registration of the copyrights at issue.

**Pattern of Appropriation**

176. Courts recognize that a constellation of similarities may collectively support a finding of copying, even where individual elements are thinly protected. Here, Defendants' appropriation extends to visual branding, choreography, and recurring motifs that echo Plaintiff's art, photography, and written Works.

**Supporting Pattern Evidence**

177. Plaintiff acknowledges that certain comparisons (e.g., "Invisible"/Invisible String; "It's Time to Go") may involve shorter phrases that are not protectable standing alone. However, these examples corroborate a broader pattern of appropriation. Courts recognize that a "constellation of similarities," even where individual elements are unprotectable, may collectively support an inference of copying. See Three Boys Music Corp. v. Bolton, 212 F.3d 477 (9th Cir. 2000).

**Additional Pattern Motifs:**

178. **Quill Pen Imagery**. Plaintiff's *Songs of the Unsung* cover features a quill pen beside musical notes (Exhibit D). Swift's Folklore branding adopted the "quill pen" concept, including a "Quill Pen Lyrics" category, echoing Plaintiff's presentation.

179. **Old-Fashioned Phone Imagery.** Plaintiff publicly posted imagery of herself holding a corded phone while whispering in a secretive manner and this was before she published her second book, prior to Swift's Midnights campaign. Swift later used a nearly identical corded phone motif to reveal secret track titles (Exhibit B).

180. **Dance Routine.** Plaintiff's choreography (documented in photos/video) includes a distinctive poses. Swift's *Vigilante Sh\*\** routine mirrors this sequence and key pose (Exhibit D).

181. Plaintiff's **photograph** of a Landscape and lake with reflection of the sky. The photo was taken by the Plaintiff of "Pinecrest Lakes" where she used to reside and included in her book, *Songs of the Unsung* (Exhibit D)

180. **Other Motifs.** Celestial destiny motifs, starships, and imagery of needing to be rescued from a "red flood", "waking up in blood".

## REBUTTAL OF PRIOR DISMISSAL AND LIMITATIONS

182. Plaintiff's prior case against Taylor Swift Productions, Inc. was dismissed at the pleading stage; that ruling has no preclusive effect here. This amended complaint alleges protectable expressions—not mere ideas or stock phrases—and provides detailed comparisons of imagery and language. The allegations support an inference of access based on public dissemination and striking similarity.

183. To the extent Defendants raise limitations defenses, Plaintiff alleges discovery of key overlaps within the last three years in connection with the Eras Tour and *The Tortured Poets Department* releases and asserts continuing accrual with each new act of exploitation.

## CLAIMS FOR RELIEF

**184.** Based on the foregoing allegations, Plaintiff asserts the following claims for relief:

- Direct Copyright Infringement (17 U.S.C. § 501): Defendants copied original, protectable expressions from Plaintiff's works without authorization, reproducing and distributing that expression in their songs, lyrics, videos, and promotional materials.

- Contributory Infringement (17 U.S.C. § 501): Defendants Dessner, Republic Records, and UMG knowingly induced, caused, and materially contributed to Defendant Swift's infringement.

- Vicarious Infringement (17 U.S.C. § 501): Defendants Republic Records and UMG had the right and ability to supervise the infringing activity and derived a direct financial benefit from the infringement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants as follows:

**185.** Actual or Statutory Damages: Award Plaintiff actual damages sustained as a result of Defendants' infringement, in an amount to be proven at trial, or, in the alternative, statutory damages pursuant to 17 U.S.C. § 504(c);

**186.** Disgorgement of Profits: Order Defendants to account for and disgorge all profits attributable to their infringing conduct pursuant to 17 U.S.C. § 504(b);

**187.** Injunctive Relief: Issue preliminary and permanent injunctive relief restraining Defendants, their officers, agents, employees, and all persons acting in concert with them, from infringing Plaintiff's copyrighted Works, and order the removal of infringing content from public distribution, pursuant to 17 U.S.C. §§ 502–503;

**188.** Costs and Attorneys' Fees: Award Plaintiff her costs of suit, and, if represented by counsel at trial or appeal, reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

**189.** Interest: Award Plaintiff pre- and post-judgment interest as allowed by law; and

**190.** Further Relief: Grant such other and further relief, at law or in equity, as the Court deems just and proper.

---

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

---

Dated: October 14, 2025

# Certificate of Service

I hereby certify that on October 14, 2025, a true and correct copy of the foregoing Second Amended Complaint, together with all attached exhibits, was served via email, by a prior Court Order permitting service by email, on counsel for Defendants, James J. Baldridge and Katherine Wright Morrone, Venable LLP, at jbaldridge@venable.com and kwmorrone@venable.com.

---

Respectfully submitted,

Kimberly Marasco
Kimberly Marasco
Plaintiff, Pro Se
1561 Pheasant Walk
Fort Pierce, FL 34950
Marasco_kim@yahoo.com