FILED BY _h C_ D.C.

DEC 08 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. PIERCE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

Case No. 2:25-cv-14067-AMC

KIMBERLY MARASCO

　　*Plaintiff,*

　v.

TAYLOR SWIFT,
REPUBLIC RECORDS,
AND UNIVERSAL MUSIC GROUP, INC.,

　　*Defendants.*

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION**
**TO DISMISS SECOND AMENDED COMPLAINT**
**AND NOTICE PRESERVING ISSUES FOR APPELLATE REVIEW**

Plaintiff, Kimberly Marasco, proceeding pro se respectfully files this Notice to preserve the

governing legal standards and related issues concerning substantial similarity, access, and

procedural rulings for any potential appellate review. This Notice also serves as Plaintiff's

opposition to Defendants' arguments in their Motion to Dismiss the Second Amended Complaint

[ECF 74].

**I. Rule 12(b)(6) Pleading Standard**

Under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations as true, draw

all reasonable inferences in Plaintiff's favor, and determine only whether the Second Amended

Complaint ("SAC") plausibly alleges copyright infringement. At this stage, the Court may not

resolve factual disputes about similarity or access, weigh competing evidence, or make

determinations reserved for the trier of fact. The SAC provides detailed factual allegations and

exhibits, so any characterization of the claims as "frivolous" is premature and inappropriate on a motion to dismiss.

## II. The SAC Is Not a Shotgun Pleading

Defendants' argument that the SAC is an impermissible "shotgun pleading" should be rejected.

- Each count identifies specific plaintiff works, specific defendant songs or videos, and the particular expressive textual overlaps at issue.

- References to "Defendants" collectively are appropriate where the theory is joint participation in infringement and distribution (author, label, and parent company) and do not deprive Defendants of fair notice.

- The SAC complies with Rules 8(a)(2) and 10(b): it uses numbered paragraphs, identifies the works and theories, and supplies concrete factual detail rather than bare legal conclusions.

If the Court finds any technical pleading deficiency, Plaintiff requests leave to amend in light of her pro se status, rather than dismissal with prejudice.

## III. Protectable Expression and Substantial Similarity

Defendants mischaracterize and convolute the SAC as seeking protection over isolated "ideas, themes, or short phrases" such as "love," "fire," or "betrayal." In reality, the SAC identified copying of concrete, original poetic expressions and combinations of words embedded in larger copyrighted works (poems), not ownership of single words. The Plaintiff has satisfied the evidentiary threshold by demonstrating striking similarity between her original works and the Defendants' later creations. The Plaintiff has presented multiple instances of verbatim phrasing drawn directly from her **original and unique expressions**, which ordinary observers **recognized**

**as evidence of plagiarism**. Even short phrases may contribute to substantial similarity when the works share unique phrasing, imagery, or narrative structure and are part of a larger work such as a poem or lyrics to a song (phrases do not contain a subject and predicate, they only add detail). The SAC identifies multiple instances of verbatim or near-verbatim full expressions in similar contexts (below is a table showing just a **few** examples):

| Plaintiff's Poem/Expression | Defendants' Song/Lyric | Similarity Type |
|---|---|---|
| "You Caged me and told me I'm crazy" (Whirlwind) | "You caged me and then you called me crazy" (Who's Afraid of Little Old Me?) | Verbatim expression; shared phrasing of another person causing insanity due to their own cause of entrapment. |
| "I caught your tear in my hand, and I fear you're drowning in your own reflection" (Innocence Lost) | Tears ricocheting feelings of pain and hurt (My Tears Ricochet) | Paraphrased expression of rebounding tears causing self-harm/same context. |
| "She is invisible… absorbing the rain and turning it into beautiful butterflies" (Invisible Matter) | Invisible string (matter) drawing to locations (Invisible String) | Shared expression of invisible guiding force causing transformation/same context. |
| "I'm Running behind, you say it's His word against mine" (Ordinary Citizen) | "I'm so sick of running as fast as I can, wondering if I'd get there quicker if I were a man" (The Man) | Verbatim expression and same context of gender inequality. |

Under settled law, infringement may be found based on paraphrasing, close rewording, and non-literal similarities in selection, coordination, arrangement, imagery, mood, and "total concept and feel," even where no single word is owned. The SAC identifies these kinds of expressive overlaps in detail, including tables and side-by-side descriptions, which more than suffice at the pleading stage.

To the extent Defendants urge the Court to "filter out" all of Plaintiff's identified expressions as unprotectable ideas or scènes à faire, that request improperly invites merits-based line-drawing at Rule 12(b)(6) rather than after a factual record has been developed.

## IV. Access

The SAC plausibly alleges access through public dissemination and industry-adjacent channels, including:

- Global distribution and marketing of Plaintiff's books through commercial publishers, (Plaintiff paid for the "Ultimate Publishing Package" costing her $1,564 to Outskirts Press to publish and globally promote and market her book. After the contract ended, another publisher published her book for free with a three-year contract).

- Books published via online retailers (such as Amazon and Barnes & Noble), and paid promotional campaigns;

- Hundreds of copies sold (ECF 65: SAC Exhibit C) and ebooks capable of easy digital forwarding;

- Social media promotion to thousands of followers and participation in online poetry and author communities; poetry contests and

- Submission of the manuscript to numerous literary agents between 2015–2020 via QueryTracker and email, creating a reasonable inference that the works could have reached persons connected to Defendants and their co-writers.

- Facebook Author and Promo Groups, as well as promoted her work on social media where she has over 9K followers prior to the filing of this complaint (ECF 65: SAC).

- Plaintiffs' books were sold via mass distribution reaching global markets including promotions in European magazines (Literatura) and other online marketing campaigns as noted in the Complaint (ECF 65: SAC Exhibit C).

- High degrees of distinctive expressive overlap between her poems and Defendants' lyrics.

- Support from Independent Observers: To further address reliability, several independent individuals (including attorneys) who reviewed the raw texts—without AI involvement—noted significant overlaps, as detailed in the SAC. This corroborates the AI's findings and underscores that the similarities are perceptible to ordinary observers, aligning with the "lay observer" test for substantial similarity. Beal v. Paramount Pictures Corp., 20 F.3d 454, 459 (11th Cir. 1994). (Due to limited resources, the Plaintiff is unable to retain an attorney for representation and that is the only reason she is pursuing her rights as a pro se litigant).

Plaintiff subsequently (and unexpectedly) lost access to her original Gmail account which contained extensive correspondence with these agents, including submissions of her manuscript (one agent stating that her work was "very interesting"). Despite repeated attempts and contacting Gmail Help Center, Plaintiff was unable to regain access though the email records may be obtainable through discovery or future proceedings.

Even if Defendants dispute these avenues of access, that is a factual issue not resolvable on a motion to dismiss. Moreover, the SAC identified multiple instances of verbatim or near-verbatim expressions and highly specific, parallel images across numerous works, which plausibly support an inference of striking similarity that can independently satisfy the copying and access elements at this stage.

## V. Personal Jurisdiction Over Universal Music Group, Inc.

Defendants contend UMGI is merely a non-operational holding company and not subject to jurisdiction. The SAC, however, alleges that UMGI "is and was doing business in the State of Florida and in this judicial district and distributes the songs listed in this complaint," and that it owns Republic Records, the label responsible for distributing and profiting from the allegedly infringing works in Florida via sales, streaming, merchandise, and live events (including the Eras Tour in Miami).

These allegations:

- Plausibly invoke Florida's long-arm statute, including operating a business in the state, committing tortious acts causing injury to a Florida resident, and engaging in substantial, not isolated, activity; and

- Satisfy due-process requirements because UMGI purposefully directs commercial exploitation of the accused works into Florida, Plaintiff's claims arise from that exploitation, and exercising specific jurisdiction is consistent with fair play and substantial justice.

At a minimum, if the Court believes the jurisdictional showing is incomplete, Plaintiff expressly requests targeted jurisdictional discovery (for example, on UMGI's Florida-related revenues, offices, and distribution arrangements) before any dismissal.

## VI. Collateral Estoppel Does Not Bar the SAC

Defendants' collateral-estoppel argument should be rejected or, at a minimum, strictly limited.

- The SAC includes additional poems, songs, copyright registrations, and refined allegations that were not before the Court in the prior action, including new combinations

of works and newly identified similarities (e.g., "Mastermind," "I Can Do It With a Broken Heart," and others marked with * in Exhibit C); and no privity with prior defendant (Taylor Swift Prods., Inc.).

- The prior dismissal was at the pleading stage without discovery, and fairness considerations weigh heavily against using that ruling to bar a pro se plaintiff's later, more detailed complaint against a different configuration of defendants.

To the extent the Court determines any specific issue is precluded, Plaintiff preserves all objections to that determination and the underlying legal standards (including protectability, access, and substantial similarity) for appellate review.

## VII. AI-Assisted Comparison Exhibit

Defendants seek to disregard the AI-assisted textual analysis attached to the SAC as "unsound". That position overstates the exhibit's role. The AI comparison is offered as an illustrative tool and incorporated chart that highlights textual overlaps; it is not proffered as expert testimony or dispositive evidence. These AI tools were used solely as a neutral, automated means to compare her copyrighted works with Defendants' lyrics objectively, without injecting personal bias into the initial identification of overlaps. This is analogous to using software for textual analysis in literary or legal contexts, such as plagiarism detection tools (e.g., Turnitin) or concordance programs that identify word patterns and thematic similarities.

- The AI tool provides a structured, side-by-side comparison of specific phrases, imagery, and concepts, directly supporting the substantial similarity element of copyright infringement.
- Plaintiff uploaded her poetry and Defendants' songs into several AI tools including ChatGPT, Grok, and Perplexity and prompted them to 'Compare the following poems and

texts for similarities". Plaintiff then manually reviewed and verified the outputs against the **original texts** to ensure accuracy.

- Courts regularly consider attached comparative charts and similar exhibits on motions to dismiss where they are central to the claim and their authenticity is not disputed; challenges to weight and reliability are for a later stage.

Regarding "requester bias," Plaintiff acknowledges that all analytical tools, including human experts, carry potential for influence. However, the AI's outputs were based directly on the inputted texts, not subjective interpretations, and Plaintiff discloses here (for transparency) that the data consisted **solely of the poems and lyrics at issue**—no external datasets or training biases were introduced beyond the AI's general knowledge. If Defendants dispute specific outputs, that is a factual issue for discovery (e.g., via interrogatories on prompts or independent AI replication), not dismissal. Challenges to reliability under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), or Federal Rule of Evidence 702 are inapplicable at Rule 12(b)(6), where the focus is plausibility, not admissibility. See, e.g., In re Tesla, Inc. Sec. Litig., 477 F. Supp. 3d 903, 921 (N.D. Cal. 2020) (considering AI-generated analyses in pleadings as illustrative, deferring evidentiary challenges). Courts increasingly recognize AI's utility in legal analysis when used transparently and supplementally. For instance, in Mata v. Avianca, Inc., No. 22-cv-1461 (PKC), 2023 WL 4114965 (S.D.N.Y. June 22, 2023), the court sanctioned misuse of AI for fabricating cases, but distinguished proper uses like **summarization or pattern identification**—precisely as employed here. Plaintiff is not citing AI as legal authority but as a tool to objectively flag similarities for the Court's consideration. Even without the AI exhibit, the SAC stands on its own detailed textual comparisons. **The AI material simply reinforces plausibility** and should not be excluded at the pleading stage.

Defendants' reliance on their prior opposition to Plaintiff's Motion for Preliminary Injunction (ECF 72 at 11-12) does not alter this. That motion involved a higher evidentiary threshold, whereas here, the Court must accept well-pleaded allegations as true and draw inferences in Plaintiff's favor. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Dismissing or disregarding the AI analysis would improperly resolve factual disputes about similarity before discovery.

## VIII. Contributory and Vicarious Infringement

Defendants argue that Plaintiff's contributory and vicarious infringement allegations against UMGI and Republic are conclusory. In context, however, the SAC identified:

- Direct infringement by Swift;

- That the label and parent company had the right and ability to control the exploitation, distribution, and monetization of the allegedly infringing works; and

- That they derived direct financial benefit from those activities and continued to distribute and profit from the works despite notice of Plaintiff's claims.

Those allegations, taken as true, are sufficient to plead contributory and vicarious liability at this stage. If the Court wants additional detail, Plaintiff requests leave to amend rather than dismissal with prejudice.

## IX. Plaintiff's Copyright Registrations

The registration for *Dealing with a Chronic Illness*, "Dealing" is TXu 2-061-218 (2017). This was a **working title,** but the **contents** are what matters which the Copyright Office has obtained. Plaintiff sent this manuscript to Outskirts Press for publication with the title, *Fallen from Grace*. A few years later, the Plaintiff sent more poetry and an updated memoir to the Copyright Office, which was registered as TXu 2-200-550 (2019). She reused the title *Fallen from Grace*, but when the book was published on Amazon, it appeared as *Songs of the Unsung*. While she understands

this might be confusing, the change in title does not affect her legal right to copyright protection for the entire works included in the submissions. Authors submit "working titles" to the Copyright Office all the time to ensure timely protection for their creations.

Furthermore, the Plaintiff found an earlier registration (TX 9-417-589) for her poetry dating back to 2015, titled *Ingenue* (Incorrectly typed "Ingenou" on the portal) with the Copyright Office. *Ingenue* contained the very first edition of her memoir and poems that later became *Fallen from Grace*. Plaintiff clearly described where each poem was published in the Complaint **(ECF 65: SAC Exhibit B)** even taking photos of the pages directly from the books and titling them *Fallen from Grace* **or** *Songs of the Unsung* with their dates of publication. There were a few additional poems that the Plaintiff wrote (Plaintiff continually writes poetry), including "Noah" that was also made into a music video (ECF 65: Exhibit C) that was sent to the Copyright Office. The SAC includes a link to the video for "Noah" when it was first published for reference (which was before the Defendants song). For reference, all four registrations are also included in this filing (Exhibits 1-4).

## X. Individual Words v. Protectable Expressions

If Plaintiff's goal was to seek protection over individual words, she would have included these words that also appeared later in the Defendants' songs, such as "Reputation" (from Plaintiff's poem, "Whirlwind"), "Step into the Daylight" (from "Innocence Lost"), "Scorpion" (from "Scorpion"), "Afterglow" (from "Ordinary Citizen"), "Ingenue" (from "Ingenue"), "Land, Sea and Sky" (from "Gaslight"), "(The) Lakes" (Plaintiff's photo of Pinecrest Lakes inspired her poem, "Sky Tinted Water"), "Heaven and Hell" (from "Beams of Light"), "lost jewelry representing loss (similar to burying one with jewelry)" (from Plaintiff's novel, *Fallen from*

*Grace*), and "Manuscript" (from *Fallen from Grace*)—these words first appeared in Plaintiff's **specific poetry** before Defendants incorporated them into their songs.

In regard to themes, Plaintiff would have noted the Defendants' use of a paper boat motif in the video for "The Fate of Ophelia" that bears resemblance to elements in the Plaintiff's poem "Cabrini," which includes verses: "a child making paper-boats / Seeing a future past the sea / It was a long treacherous sail / Arrived in the new land / Deep in the night / Put on my cloak and lowered my veil / Held my rosary tight / Here I wait / For the day to greet the night / Under a moonlit sky / … she (Cabrini) was sent to build an Empire of Hope…." Additional descriptions in "Cabrini" echo concepts used by the Defendants, though these were **not included** in the complaint, as they do not constitute copyright violations (e.g., shared themes or isolated words). Such similarities could support textual analysis to demonstrate a pattern of conceptual borrowing, but they underscore that the Plaintiff asserts rights only over **specific, original expressions** that the Defendants have paraphrased or derived from her works. To reiterate, the Plaintiff **did not** include these isolated words or themes even if they **may have sparked ideas** or gave rise to some of the songs produced by the Defendants. The Plaintiff only included original and unique expressions that are a part of her poetry collection (ECF 65).

The Defendants misrepresent the Plaintiff's claims by taking words out of context. For example, the Defendants stated Plaintiff is asserting copyright over individual words such as "invisible." For clarity, the word "invisible" refers to something that cannot be seen. However, in the Plaintiff's poem, "Invisible Matter," this term forms part of a protectable, original expression: "She is invisible… she carries the omniscient butterfly… absorbing the rain and turning it into beautiful butterflies." This describes an invisible force guiding the subject to specific places and effecting change. The Defendants appropriated this expression in their song "Invisible String,"

which similarly depicts an invisible element (matter) drawing the subject to certain locations and causing transformation. Another example involves the word "tears," which typically denotes liquid produced by strong emotions. In the Plaintiff's poem "Innocence Lost," the verse states: "I caught your tear in my hand, and I fear you're drowning in your own reflection." Here, tears are portrayed as reflecting back onto the person causing them, creating a unique, original, metaphorical expression. The Defendants copied this original concept in their song "My Tears Ricochet," employing the same idea of tears rebounding or ricocheting against the source of pain. There are **dozens** of additional instances where the Plaintiff's original expressions from her poetry—not mere isolated words—were appropriated by the Defendants for their songwriting, as detailed in the Second Amended Complaint (ECF 65).

To illustrate this distinction, the Plaintiff cites Kearns v. Ford Motor Co., 726 F. Supp. 159 (E.D. Mich. 1989), where inventor Robert Kearns (proceeding pro se) sued Ford and Chrysler for copying his intermittent windshield wiper invention. During cross-examination, Kearns had Ford's expert read the opening paragraph of Charles Dickens' <u>A Tale of Two Cities</u>, leading the expert to admit that Dickens did not invent any individual words but derived artistry from their arrangement. This analogy applies here: the Plaintiff claims no rights over single words but over the creative, original arrangements and expressions in her works.

After investing nearly $2,000 in marketing and promotion, Plaintiff discovered that internet searches for her original expressions returned only Defendants' songs, not her own work. This demonstrates **striking similarity** and further diminishes the originality of Plaintiff's creations, as the widespread familiarity of Defendants' songs overshadows her contributions to the perception of the average layperson.

Substantial similarity is not limited to verbatim copying; it extends to paraphrasing and to non-literal similarities in selection, coordination, arrangement, structure, imagery, metaphor, mood, pace, and the overall "total concept and feel" of the works (Beal v. Paramount Pictures Corp., 20 F.3d 454, 460–63 (11th Cir. 1994)). This broader inquiry encompasses similarities in narrative structure, visual motifs, recurring imagery, emotional tone, thematic development, and symbolic devices when expressed through distinctive creative choices. Critically, the Eleventh Circuit has long recognized that infringement can occur through paraphrasing or rephrasing of the plaintiff's original expression, even absent identical wording. Moreover, Plaintiff has identified multiple verses in Defendants' work that are verbatim identical to Plaintiff's copyrighted verses. See Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 829 (11th Cir. 1982) (holding that "similarity of expression" may constitute infringement even when achieved through different words or paraphrasing). Other courts likewise confirm that paraphrasing will not avoid infringement. Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936) (noting that "no plagiarist can excuse the wrong by showing how much of his work he did not pirate"); see also Shaw v. Lindheim, 919 F.2d 1353, 1361 (9th Cir. 1990) (stating that minor changes do not necessarily preclude a finding of substantial similarity). Cases such as Rogers v. Koons, 960 F.2d 301 (2d Cir. 1992), Boisson v. Banian, 273 F.3d 262 (2d Cir. 2001), and Williams v. Gaye, No. 15-56880 (9th Cir. 2018) further emphasize that infringement may be found based on the overall expressive feel, even without identical wording. "The law recognizes infringement even where the defendant only paraphrased or closely mimicked the plaintiff's work." Warner Bros. v. American Broad. Cos., 720 F.2d 231, 241 (2d Cir. 1983). Furthermore, several attorneys with extensive backgrounds in copyright law noticed the infringement with one commenting that "(Swift) did a lot of copying".

Additionally, in a prior response to a motion, the Defendants characterized the Plaintiff's actions (ongoing for nearly two years) as "harassment." The Plaintiff rejects this assertion, as she is enforcing her rights to copyright protection for her work that she created. The extended timeframe primarily resulted from delays in service from process servers who had a difficult time trying to locate Swift and waiting for responses. Initially, the Plaintiff filed a complaint with a Small Claims Court requesting only credit for her contributions (minus a small reimbursement fee of $100) believing that the Defendant would oblige since the infringement is so obvious. Instead, the Defendant's attorneys transferred the case to Federal Court to dispute it instead.

On the contrary, the Plaintiff has faced significant harassment from "Swifties" including attacks on social media, other websites, and even comments from co-workers in prior employment settings. This harassment escalated to threats of physical harm, causing the Plaintiff to fear leaving her home at times. On a good note, the Plaintiff also received a lot of support and agreement from others noting that there are many similarities between her works and some of the songs produced by the Defendants. An attorney even mentioned that it will come down to "who wrote it first". The Plaintiff's copyright registrations show proof of authorship. As early as 2015, Plaintiff's book, *Fallen from Grace,* was initially titled "Ingenue" (a rare word used at the time picked up by the Plaintiff from reading an article when she was a flight attendant). "Ingenue" contained many of the original poems later included in the finalized book and was included in later registrations for her works.

Furthermore, several media website articles, including supportive comments from the community, that put the Plaintiff in a positive light are either deleted or shadow-banned. For example, Rolling Stones posted an article about how Defendant Swift seems to be "dodging" the lawsuit as the Plaintiff hired several process servers and sheriffs to deliver the complaint but

faced extraordinary difficulty due to her security measures. For example, clicking on the URL for the website below now returns a "404 Error" which means it was deleted: http://www.rollingstone.com/music/musicnews/taylor-swift-accused-dodging-lawsuit-copyrightinfringement-1234961645/.

One of the songs by the Defendants, titled "thanK you aIMee," includes the lyric, "a song that only us two is gonna know is about you." Although the public may interpret this as a reference to Kim Kardashian due to a well-known feud between Swift and Kardashian dating back to 2016—**nearly a decade ago**—such an interpretation is inconsistent with the lyric's implication of secrecy between only two individuals. If the song were truly about Kardashian, the feud's public nature would render the notion of exclusive knowledge illogical. Moreover, additional lyrics in the song, such as "screaming at the sky," align closely with the Plaintiff's distinctive writing style. The Plaintiff also personally knows an individual named "Aimee" (with the identical spelling), suggesting that the reference may not be coincidental. While this song is not explicitly included in the complaint, it underscores potential connections between the Defendants' work and the Plaintiff's. Nonetheless, any indirect gesture of acknowledgment or "thanks" in the song falls far short of adequate credit or compensation for the unauthorized use of the Plaintiff's copyrighted works.

Defendant Taylor Swift purportedly wrote 32 tracks between two albums "Folklore" and "Evermore" in a very short timeframe (the same albums where the Plaintiff discovered most of the infringing songs). No other musician that the Plaintiff is aware of (except for Prince who routinely wrote for other musicians using pseudonyms) has accomplished such a prolific output in such a short time, particularly given the acknowledged difficulty of developing original song concepts. Taylor Swift has been widely recognized as a "brilliant songwriter" by numerous

media outlets, and her work is the subject of academic study at several colleges and universities, where her techniques, lyrics, and artistic evolution are analyzed in detail. By achieving extraordinary commercial success, the Defendants have established a benchmark against which other artists are now *seemingly* unfairly measured. Singer Halsey has publicly stated that the industry is requiring her to deliver "Manic numbers" before permitting the release of new work, thereby illustrating how artists are being compelled to meet standards derived from Swift's commercial performance rather than their own creative merit. This practice deprives audiences of future works from exceptional songwriters such as Halsey and others similarly situated. Moreover, the Defendants' reliance on inappropriate tactics to secure such achievements creates an inequitable environment for their peers. These circumstances underscore the necessity of enforcing copyright protections to ensure fairness, safeguard originality, and preserve the integrity of artistic expression of all individuals.

The Defendants also noted that the Plaintiff ceased offering her books for sale. This occurred after two publishing contracts expired, and sales on Amazon KDP were halted due to "Swifties" purchasing copies solely to post negative reviews, aiming to undermine Plaintiff's claims. Despite securing copyright registrations for her works, the Plaintiff's rights have been violated, necessitating this litigation to enforce them. Plaintiff has authored dozens more poems but hesitates to share them publicly due to this reason. Plaintiff's distinctive and original poetry required substantial time, creative input, and originality to make and so she obtained registrations for them believing they would safeguard them, but she is now battling a difficult fight to enforce those rights. This struggle not only harms her but also discourages any aspiring author who lacks an established reputation, ultimately halting creative progress by rendering copyright protections futile at safeguarding original works.

Furthermore, Plaintiff holds a bachelor's degree in history, a background that informs her creative writing on historical events and figures. This thematic focus parallels the Defendants' own songwriting, further supporting an inference of substantial similarity and potential copying. But even without proof of access, the "probative" or "striking" similarities (which go beyond common ideas focusing on unique expressions) lowers the access threshold, allowing inference of copying even with weaker dissemination evidence (albeit, the Plaintiff's books were published via mass distribution reaching global markets).

## XI. Preservation of Issues Regarding the Dismissal of Defendant Aaron Dessner

Plaintiff preserves for appellate review any ruling dismissing Defendant Aaron Dessner under Rule 4(m). Plaintiff maintains that: Dessner was personally served on March 11, 2025, · Service was supported by a sworn process-server affidavit, contemporaneous notes, and photographic verification, and Defendants waited over five months before objecting to service, a delay that is inconsistent with the requirement that service objections be raised promptly. Such delay may support waiver, estoppel, or prejudice to Plaintiff. Although Plaintiff voluntarily dismissed Defendant Jack Antonoff without prejudice before understanding the full legal consequences of Defendants' delayed objections, she preserves any argument relevant to the impact of such delays on procedural rulings. Any dismissal of these Defendants does not alter the substantial similarity claims against the remaining Defendants.

**XII. Preservation of Error for Appeal**

Plaintiff expressly preserves all claims involving substantial similarity between her poems—including, but not limited to: "Ordinary Citizen," "Ingenue," "Whirlwind," "Scorpion," "Beams of Light," "Gaslight," "Innocence Lost," "Sky Tinted Water," "Devious Minds," "Delusional Reality," "Noah." Finally, all similarity and access theories are preserved for appellate review. Plaintiff respectfully preserves for appellate review:

- All substantial similarity claims.

- Access and striking similarity theories.

- Ordinary observer. test application.

- Premature filtering of expressive elements.

- Dismissal without discovery.

- Service issues for Dessner (e.g., affidavit provided by the process server & waiver by delay).

- Plaintiff opposes any jurisdictional arguments in Defendants' Motion to Dismiss as untimely or waived.

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss the Second Amended Complaint in its entirety. In the alternative, if the Court identifies any deficiencies, Plaintiff requests leave to amend pursuant to her pro se status and/or limited jurisdictional discovery, including on Universal Music Group, Inc.'s Florida-related activities, revenues, offices, and distribution arrangements, before any dismissal.

Respectfully submitted,

*Kimberly Marasco*

December 8, 2025

Kimberly Marasco
Plaintiff, pro se
1561 Pheasant Walk Apt C
Fort Pierce, FL 34950
772.277.1785
marasco_kim@yahoo.com

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2025, I served a true and correct copy of the foregoing Notice on counsel for Defendants via email pursuant to Federal Rule of Civil Procedure 5(b)(2)(E).

*Kimberly Marasco*